UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

GRAHAM WAITING,                          )
                                         )
            Plaintiff,                   )
v.                                       )          CIVIL ACTION
                                         )          NO. 14-14742-IT
BLUE HILLS BANK and BLUE HILLS           )
BANCORP, INC., a Maryland Corporation,   )
                                         )
            Defendants.                  )

# REPORT AND RECOMMENDATION ON
# CROSS-MOTIONS FOR SUMMARY JDUGMENT

February 8, 2017

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiff, Graham Waiting ("Waiting"), was employed as the Treasurer and, later, the

Controller, of Blue Hills Bank. His employment was terminated in October 2013. The Bank[1]

contends that Waiting's position was eliminated as part of a reorganization of his department.

Waiting contends that his termination was in response to his having filed internal and external

complaints against the Bank in connection with its participation in the Small Business Lending

Fund and its outsourcing of its investment portfolio. He has brought suit alleging three counts

of wrongful retaliation against a whistleblower under various theories.[2]

---

[1] No distinction has been made by the parties between the two defendants. Therefore, they will be
collectively referred to as "Blue Hills" or the "Bank."

[2] Waiting has withdrawn his claim that he was retaliated against for taking FMLA leave.

This matter is presently before the court on cross-motions for summary judgment. In particular, the defendants have moved for summary judgment on all counts of the complaint, alleging that Waiting has failed to state a claim for wrongful retaliation under any of the proffered theories. For the reasons detailed herein, this court finds that there are material facts in dispute, and recommends to the District Judge to whom this case is assigned that "Defendants' Motion for Summary Judgment" (Docket No. 51) be DENIED.

This matter is also before the court on "Plaintiff's Motion for Partial Summary Judgment on Issue of Protected Activity (Counts I and II)." (Docket No. 54). By this motion, the plaintiff is seeking a ruling that he engaged in protected activity under the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1831j(a)(1), and under the employee protection provisions of the False Claims Act, 31 U.S.C. § 3730(h). For the same reasons, this court finds that the material facts relating to these claims are in dispute. Therefore, this court recommends to the District Judge to whom this case is assigned that plaintiff's motion (Docket No. 54) also be DENIED.

## II. STATEMENT OF FACTS[3]

### Background

Waiting was hired by the Bank on November 15, 2010. DF ¶ 1. He first held the position of Senior Vice President and Treasurer. Waiting Decl. ¶ 1. According to Waiting, he wanted to

[3] Unless otherwise indicated, the facts are derived from the "Defendants' Statement of Undisputed Material Facts In Support of Their Motion for Summary Judgment" (Docket No. 52) ("DF") and exhibits thereto ("Defs. Ex. ___"); "Declaration of Plaintiff re Summary Judgment Motions" (Docket No. 54-1) ("Waiting Decl."); "Statement of Material Facts per L.R. 56.1 in Support of Plaintiff's Motion for Partial Summary Judgment on Issue of Protected Activity" (Docket No. 55) ("PF"); "Defendants' Response to Plaintiff's Statement of Material Facts in Support of their Opposition and Cross-Motion for Summary Judgment" (Docket No. 64) ("DR"); "Plaintiff's Statement of Disputed Material Facts" (Docket No. 65)

be relieved of his obligations as Treasurer in November 2011 because he "knew that [his] continuous objections to the Bank's investment strategy and accounting practices would likely adversely affect [his] employment, if not [his] entire career." Id. ¶ 7. Therefore, he became Controller/Senior Vice President, Finance, effective December 15, 2011. Id. His employment was terminated in October 2013. DF ¶ 8. As detailed herein, Waiting contends that he was retaliated against as a result of complaints he made in connection with the Bank's participation in the Small Business Lending Fund ("SBLF"), and the Bank's conduct in connection with its outsourcing of investment management functions. The Bank denies any wrongdoing and contends that Waiting's position was eliminated as part of a reorganization. The relevant facts are as follows.

## The SBLF Fund

Congress established the SBLF in 2010 to stimulate small business lending, among other things. DF ¶ 21. The Bank was approved by the Department of Treasury to participate in the SBLF program after submitting an application in June 2011. Id. ¶ 26. Only certain loans made by the Bank qualified under the SBLF program. Id. ¶¶ 30-32. According to the Bank, it engaged in an extensive, multi-step process to determine whether a loan qualified. Id. Thus, designated employees from the Bank's accounting and lending functions, as well as the Bank's CFO, reviewed each loan that was identified as qualifying under the SBLF program, the Bank communicated with Treasury about how to treat certain loans, and the Bank consulted its outside accounting firm, Wolf & Company, P.C. ("Wolf"), as well as outside legal counsel, when

_____

("PDF"); and "Supplemental Statement of Material Facts per L.R. 56.1 in Support of Plaintiff's Motion for Partial Summary Judgment on Issue of Protected Activity" (Docket No. 67) ("PSF").

questions arose about loan classifications.  Id.  In addition, the Bank issued quarterly SBLF reports that were audited each year by Wolf, and a final time by the Treasury when the SBLF loan was paid off.  Id. ¶ 32.

According to Waiting, in his opinion the Bank violated the rules of the SBLF program virtually from the outset, and continued to do so throughout his employment with the Bank. See Waiting Decl. ¶¶ 27-30.  Among the actions Waiting objected to were the Bank's accounting practices in connection with these loans.  See id. ¶ 27.  In addition, in Waiting's opinion, two loans, known as the Dean College loan and the Laboure College loan, were misclassified as SBLF qualifying loans.  First Amended Complaint (Docket No. 34) ("Compl.") ¶ 40.  According to Waiting, he "concluded that the Bank deliberately misclassified these loans to increase its small business loan amount in the eyes of the Treasury, reduced its dividend payments that it in fact owed to the Treasury, and instead keep that money for itself."  Waiting Decl. ¶ 39.

According to the Bank, both the Dean College loan and the Laboure College loan started out as loans, and were later converted to industrial revenue bonds.  DF ¶ 33.  Since these were the first loans of their kind to be considered for the SBLF program, the Bank sought guidance from its outside auditor and from the Treasury, and acted accordingly.  Id. ¶¶ 33-34.  Neverthe-less, in December 2012, Waiting expressed his concerns about the classification of these loans to Stephen McNulty, the Bank's CFO ("McNulty").  Compl. ¶¶ 41, 69.  He also raised these same concerns with the Bank's Personnel and Internal Audit departments in June and July 2013.  Id. ¶¶ 41, 67.

## The Outsourcing of the Investment Portfolio

In 2010, the Bank decided that it should retain outside investment advisors to manage the Bank's portfolio. DF ¶ 39. The Bank's Investment Advisory Committee decided to hire Pacific Investment Management Company ("PIMCO") and Investment Research & Management ("IRM") as the outside investment managers. Id. ¶ 40. PIMCO and IRM provided daily reports to the Bank's Treasurer of all trades conducted. Id. ¶ 47. In addition, Bank staff issued daily position reports to the Treasurer, CFO, President, and Senior VP of Corporate Strategy; weekly recap and portfolio reports to the Bank's Management Investment Committee; and monthly and quarterly investment reports to the Bank's Board of Directors, Executive and Risk Management Committee, and Investment Advisory Committee. Id.

Waiting was opposed to the Bank's decision to outsource its investment management. In response to his concerns, Waiting received permission to retain counsel to advise the Bank on the propriety of this decision. Id. ¶¶ 42, 44. The Bank retained an attorney recommended by Waiting at the law firm of Craig & McCauley, who, according to the Bank, determined that the FDIC permitted the Bank to delegate investment authority to third parties. Id. In addition, the decision to hire PIMCO and IRM was presented to the Bank's Investment Advisory Committee in August 2011, at which time Waiting expressed his concerns and dissented from the decision to engage outside investment advisors. Id. ¶ 43; see Waiting Decl. ¶ 45.

According to Waiting, the Bank failed to comply with FDIC regulations from the beginning of its relationship with the outside investment managers. See Waiting Decl. ¶ 15. Among other things, Waiting believed that the Bank's own ledger and accounting systems were inadequate, and that the frequency and volume of the investments handled by PIMCO in

particular were in violation of FDIC requirements.  See, e.g., id. ¶¶ 14, 16-19.  According to

Waiting, he expressed his concerns to CFO McNulty in July 2012.  Id. ¶ 46.  In August and

September 2012, he again expressed his concern to McNulty, as well as to Senior Vice President

and Chief Credit Officer Thomas Sommerfield, and to President William Parent ("Parent").  Id.

¶ 47.  On March 8, 2013, Waiting filed a report with the Bank's internal auditor, Miki DePeiza,

arguing that PIMCO's trading activity should be suspended immediately.  Id. ¶ 48.

### Waiting's Complaint to the Federal Reserve Bank and the FDIC

In June 2013, Waiting filed a complaint with the Federal Reserve Bank, which then

forwarded the complaint to the Federal Deposit Insurance Corporation ("FDIC").  Compl. ¶ 78;

Waiting Decl. ¶ 49.  As the Bank describes Waiting's complaint:

> Waiting raised concerns about the Bank's decision to outsource the
> management of its investment portfolio, and the Bank's capacity to
> support and properly account for its investment portfolio.  *See generally*
> Complaint ¶¶ 19-35.  Waiting also alleged that the Bank had deliberately
> misused Treasury funds provided under the SBLF program, and deliberately
> misclassified two loans as SBLF qualifying loans to reduce the amount the
> Bank was required to pay to the Treasury in dividends.  *See generally*
> Complaint ¶¶ 36-41.

Bank Mem. (Docket No. 53) at 5.  Waiting further informed a Case Manager at the Federal

Reserve Bank that he was concerned that the Bank would destroy relevant evidence.  Waiting

Decl. ¶ 49.  On or about July 24, 2013, Waiting provided Bank President Parent with a redacted

copy of the complaint.  DF ¶ 5; Waiting Decl. ¶ 49.

After receiving the complaint, the Bank's Audit Committee retained the law firm of

Clements & Pineault, LLP to conduct an investigation, which was led by the named-partner,

Michael Pineault.  DF ¶ 6.  Waiting was interviewed on August 6, 2013, and later provided

documentary information as well.  Waiting Decl. ¶ 50.  According to Waiting, "the Bank was

forced to refile many, if not every, FDIC Call Report since December 2012 in order to correct the deficiencies in the reporting." Id. ¶ 51.  According to the Bank:

> On September 30, 2013, after a two month investigation that included interviews with seventeen individuals, Clements & Pineault issued a comprehensive twenty-seven page single-spaced report detailing the results of the investigation.  The report did not find any inadequacies in the Bank's monitoring of PIMCO and IRM as outside investment managers, and found that the Bank's operations were sufficient to monitor these outside investment managers.  Further, Clements & Pineault determined that any existing accounting issues at the Bank had no material impact on the Bank's income statements.  Finally, Clements & Pineault found no merit to Waiting's concerns that the Bank had misclassified loans or otherwise misused Treasury funds provided to the Bank under the SBLF program.

Bank Mem. at 6 (record citations omitted).

### Reorganization at the Bank

In September 2013, the Bank hired a new CFO, James Kivlehan ("Kivlehan"), after an extensive search and interview process.  DF ¶ 11.  According to the Bank, Kivlehan was charged "with creating a finance organization that was a strength to the Bank, with well-defined processes, accurate and timely closing of books, a budget system that would be a measurement tool for the organization, and analytical capabilities that would help the Bank make key decisions as the Bank grew in the future, all within a positive, collaborative environment." Id. "Kivlehan was to have free reign and complete independence in his decision-making" in connection with his evaluation of the departments at the Bank, and his development of "a plan to position the Bank for growth in the future." Id. ¶ 12.

It is undisputed that Kivlehan knew that a whistleblower complaint had been filed with the FDIC before he started his work at the Bank.  PDF ¶ 4.  Although it is unclear when, or through whom, he learned that the complaint had been filed by Waiting, it is also undisputed

that he knew about it before Waiting's employment with the Bank was terminated.  Id. ¶¶ 4-5.

According to the Bank, however:

> Because the Bank wanted Kivlehan to complete his assessment of the Finance Department independently, the Bank intentionally did not inform Kivlehan about the contents of Waiting's complaint that had been forwarded to the FDIC.  Parent only told Kivlehan that a whistleblower complaint existed and that it concerned "accounting irregularities," and Parent instructed Kivlehan not to ask about or discuss the complaint with anyone else. Kivlehan had no involvement in the Bank's investigation of the concerns raised by Waiting in his complaint, did not read Waiting's complaint, and did not ask Waiting or anyone else about it.
>
> Kivlehan completed his review and assessment of the Bank's Finance Department in a timely manner, and determined that he needed to make several changes.  Kivlehan concluded that (1) the Bank's Finance Department lacked clear direction and job responsibilities within the Department were not clearly defined; (2) the Finance Department staffing was "top heavy," and (3) the Department lacked strong senior leadership and a clearly defined reporting structure.
>
> Based on these conclusions, Kivlehan determined that the Bank needed to streamline its senior level management in the Finance Department.  At the time of Kivlehan's review, the Finance Department's accounting and tax responsibilities were spread between two positions: the Controller position, held by Kate Peterson ("Peterson"), and the Senior Vice President, Finance position held by Waiting.  Kivlehan determined that only one person was needed to oversee the Bank's accounting and tax functions.  Between the two candidates for this single position, Peterson and Waiting, Kivlehan found Peterson to be the more qualified candidate.  Kivlehan memorialized his decision to eliminate Waiting's position in an October 1, 2013 summary memorandum that he provided to Parent.  As noted, Kivlehan had no knowledge of the substance of Waiting's complaint that had been forwarded to the FDIC, and Waiting's complaint played no factor in Kivlehan's decision to eliminate Waiting's position.

Bank Mem. at 6-8 (record citations omitted).  The Bank further contends that Parent would have approved Kivlehan's proposed reorganization even if Kivlehan had recommended that Waiting stay and Peterson's position be eliminated.  DF ¶ 19.

Waiting challenges the Bank's assertion that it would have retained him if Kivlehan had made that recommendation.  See PDF ¶ 33.  He also disputes the Bank's assertion that the decision to eliminate his position was unrelated to his complaint.  According to Waiting, Peterson had been moved to the Finance Department just a few months earlier by Kivlehan's predecessor, McNulty, thereby creating the "top heavy" department.  See id. ¶¶ 24-26.  Additionally, no one else's employment with the Bank was to be terminated as part of Kivlehan's proposed reorganization.  Moreover, Kivlehan's proposal that Waiting's position be eliminated was approved by Parent, who admittedly knew that Waiting had filed the complaint with the FDIC, as well as the content of the complaint.  DF ¶¶ 13, 19.  Thus, Waiting contends that Peterson was transferred to the Finance Department for the purpose of justifying his removal, and that the Bank's decision to terminate him occurred in retaliation for his protected conduct.

Additional facts will be provided below where appropriate.

### III.  ANALYSIS -
### THE BANK'S MOTION FOR SUMMARY JUDGMENT

### A.    Summary Judgment Standard of Review

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (citation omitted)).  The burden is on the moving party to show, based upon the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"

<u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008) (quoting <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is 'material' only if it possesses the capacity to sway the outcome of the litigation under the applicable law."  <u>Id.</u> (alteration in original) (citations omitted).

 "Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue."  <u>PC Interiors</u>, 794 F. Supp. 2d at 275 (citation omitted).  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841-42 (1st Cir. 1993).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading.'"  <u>Id.</u> at 841 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)).

 "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  <u>Adria Int'l Grp., Inc. v. Ferre Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir. 2001).  "'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'"  <u>Peck v. City of Boston</u>, 750 F. Supp. 2d 308, 312 (D. Mass. 2010) (quoting <u>Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc.</u>, 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

 Applying these principles to the instant case compels the conclusion that both pending motions for summary judgment be denied.

B.        **Retaliation Under the False Claims Act**

Waiting alleges in Count II of his First Amended Complaint that his employment was terminated in response to his complaints about the Bank's conduct, which conduct Waiting believed constituted violations of the False Claims Act, 31 U.S.C. §§ 3729, 3730 ("FCA"). Specifically, Waiting contends that the Bank's alleged misuse of Treasury funds and misclassi-fication of the two specific loans as SBLF qualifying loans constituted potential violations of the FCA.  See Bank Mem. at 11.  The Bank contends that Waiting cannot establish a prima facie case of retaliatory discharge under the FCA and that, even if he can, there was a legitimate non-retaliatory reason for the termination of his employment.  For the reasons detailed herein, this court recommends that the Bank's motion for summary judgment as to Waiting's claim under the FCA be denied.

### Overview

"FCA liability attaches to any individual who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)(A), or 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim,' *id.* § 3729(a)(1)(B)."  United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 380 n.3 (1st Cir. 2011).  In this case, Waiting is basing his FCA claim on the statute's provision regarding so-called "reverse false claims," which provides in pertinent part that a reverse violation of the FCA may be established when a contractor or recipient of federal dollars:

> knowingly makes, uses, or causes to be made or used, a false record or
> statement material to an obligation to pay or transmit money or property to
> the Government, or knowingly conceals *or knowingly and improperly avoids*

> *or decreases an obligation to pay or transmit money* or property to the
> Government....

Pl. Mem. (Docket No. 66) at 5 (emphasis in original) (quoting 31 U.S.C. § 3729(a)(1)(G)).

In order to constitute a violation of 31 U.S.C. § 3729(a)(1)(G), the challenged actions must have been made "knowingly."  According to the statute, "[a] person acts 'knowingly' if he or she '(1) had actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.'"  Hutcheson, 647 F.3d at 380 (quoting 31 U.S.C. § 3729(b)).  The Act further provides "that the term 'knowingly' requires 'no proof of specific intent to defraud.'"  Id.

The FCA provides that an employee cannot be "discriminated against in the terms and conditions of employment because of lawful acts done by the employee" in furtherance of an action brought against the employer under the FCA, or for engaging in "efforts to stop 1 or more violations of" the FCA.  31 U.S.C. § 3730(h)(1).  "To prevail on a False Claims Act retaliation claim, a plaintiff must show that (1) the employee's conduct was protected under the FCA; (2) the employer knew that the employee was engaged in such conduct; and (3) the employer discharged or discriminated against the employee because of his or her protected conduct."  United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 235 (1st Cir. 2004) (alteration in original).  Once the employee has established a prima facie case of retaliation, the burden shifts to the employer to articulate a non-retaliatory reason, i.e., "that the employee would have been terminated or subjected to other adverse action even if he or she had not engaged in the protected conduct."  Id.  This is a burden of production, not proof.  Harrington v. Aggregate Indus. Ne. Region, Inc., 668 F.3d 25, 31 (1st Cir. 2012).  "Thus, if the employer produces evidence of a legitimate nonretaliatory reason, the plaintiff must assume

the further burden of showing that the proffered reason is a pretext calculated to mask retaliation." Id.

## Was Waiting's Conduct Protected Under the FCA?

The Bank contends that Waiting was not engaged in protected conduct under the FCA because he could not have reasonably believed that the Bank was "knowingly" engaged in wrongful conduct given the safeguards it had put in place to insure compliance with its obligations under the SBLF program. According to the Bank, Waiting cannot, therefore, satisfy the first prong of his prima facie case. This court finds that there are material facts in dispute. Accordingly, it recommends that the issue be resolved by a jury.

"[C]onduct protected by the FCA is limited to activities that 'reasonably could lead' to an FCA action; in other words, investigations, inquiries, testimonies or other activities that concern the employer's knowing submission of false or fraudulent claims for payment to the government." Karvelas, 360 F.3d at 237. Of relevance here, however, is that "protected conduct" is interpreted broadly. United States ex rel. Gobble v. Forest Labs., Inc., 729 F. Supp. 2d 446, 449 (D. Mass. 2010). The employee "need not have known that his actions could lead to a qui tam suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." Id. (citing Karvelas, 360 F.3d at 237). Similarly, the employee's investigation does not have to bear fruit. "A retaliation claim may survive even if the whistle-blower claim on which it is based does not." United States ex rel. Provuncher v. Angioscore, Inc., No. 09-12176-RGS, 2012 WL 1514844, at *5 (D. Mass. May 1, 2012) (and cases cited). An employer cannot retaliate against an employee for engaging in lawful actions done in furtherance of an FCA action filed, or to be filed, "even if the target of an investigation or action

[13]

to be filed was innocent." Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson, 545 U.S. 409, 416, 125 S. Ct. 2444, 2449, 162 L. Ed. 2d 390 (2005). All that is required is that the employee have a "reasonable" or "good faith belief" that a violation existed. See id. at n.1.[4]

As detailed above, the Bank argues that it was not reasonable for Waiting to have believed that it was "knowingly" engaged in any wrongdoing, given the number of people/entities who gave the Bank advice and reviewed the SBLF program. This included multiple levels of internal review, communications with Treasury, and consultation with outside legal counsel and auditors. For his part, however, Waiting argues that the Bank manipulated the information given to various reviewing entities, and he otherwise challenges the efficacy of some of the alleged safeguards instituted by the Bank. See, e.g., Waiting Decl. ¶¶ 20-40, 52-54. In addition, some of the reviews undertaken by the Bank occurred after Waiting made his complaints, so they would not negate a finding that he had a reasonable or good faith belief that a violation existed at the time he made his complaints. See id. at 50-51. In short, the record is not so clear that this court can rule, as a matter of law, that Waiting could not reasonably, and/or in good faith, have believed that the Bank was engaged in conduct that violated the FCA. There is evidence from which a jury can find that Waiting satisfied the first element of his retaliation claim, i.e., that he engaged in conduct that was protected by the FCA.

---

[4] Waiting contends that the standard is whether he had a "reasonable belief" that a violation was being committed, while the Bank states that he had to have a "good faith belief that violations exist." See Pl. Mem. at 6; Bank Mem. at 12. Cases use different language. See Graham Cty., 545 U.S. at 416 n.1, 125 S. Ct. at 2449 n.1 (and cases cited). Any distinction is not relevant to this court's analysis at this time, so it will not be explored further.

## The Bank's Knowledge of Waiting's Protected Conduct

Under the second prong of the prima facie standard, Waiting must show that the Bank knew that he was engaged in conduct that was protected under the FCA. The Bank argues that Waiting cannot meet this burden because the evidence shows that Kivlehan, who terminated Waiting's employment, only knew that Waiting had filed a "whistleblower complaint" concerning "accounting irregularities," but did not know the details and never saw the actual complaint. It also argues that there is no evidence that Parent, who knew the details of Waiting's complaint, played a role in the decision to eliminate his position. See Bank Mem. at 13-14. Again, this court recommends that the facts be sorted out by a jury.

It is undisputed that Kivlehan had been informed that Waiting was a whistleblower and had filed a whistleblower complaint with the FDIC before he made the decision to reorganize Waiting's department. There is also testimony that Kivlehan thought that it was "an extreme thing" for Waiting to have done. PDF ¶ 3. The parties have not cited any cases to the effect that the employer has to know all the details of the employee's complaint to be held liable for retaliation. Here, the decision-maker knew that Waiting was a whistleblower and had filed a complaint with the FDIC. It is not a far leap for a factfinder to conclude that the Bank knew that Waiting had been engaged in conduct that was protected by the FCA.

Moreover, despite the Bank's protestation that Kivlehan made the decision unilaterally, there is evidence from which the jury can find that Parent, the Bank's President, was consulted in connection with the reorganization plan and approved the plan. Since Parent knew the details of Waiting's FDIC complaint, this may be sufficient to establish the Bank's knowledge of Waiting's protected activities. See Harrington, 668 F.3d at 31-32 ("To clear the low bar required

to establish a prima facie case, the fact that high-level . . . executives learned of the appellant's whistleblowing several months before his firing suffices to show knowledge.").  In sum, there is evidence from which a jury can find that the employer was "put on notice that the employee [was] taking action that reasonably could lead to an FCA case" at the time Waiting's employment was terminated.  Maturi v. McLaughlin Research Corp., 413 F.3d 166, 172 (1st Cir. 2005).

## Proof of Causation

Finally, the Bank argues that Waiting cannot establish the third element of his prima facie case, namely that his employment was terminated "because of" his protected activity. Rather, according to the Bank, his employment was terminated as part of a reorganization that took place months after Waiting had filed his complaint with the FDIC.  Again, the resolution of this issue is most appropriately left to the jury.

Here, Waiting's employment was terminated as part of a "reorganization" that involved the elimination of only one position — his.  The Bank received Waiting's complaint on July 24, 2013, Kivlehan started work at the Bank on September 9, 2013, and Waiting's employment was terminated on October 10, 2013.  The termination took place while the complaint was still pending.  All of these factors, including the close temporal proximity between Waiting's complaint and the termination of his employment, may be considered by the factfinder in determining whether there was retaliation.  See Harrington, 668 F.3d at 33 ("deviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events" can be considered, and may "create a trialworthy issue about whether [the employer's] proffered reason for firing [the employee]

was a sham.").  In sum, the record does not support a finding, as a matter of law, that Waiting

cannot establish his prima facie case of retaliation.

### The Bank's Explanation for Its Decision

The Bank argues that even if this court were to conclude that Waiting has established

his prima facie case of retaliation under the FCA,

> the record evidence demonstrates that Kivlehan had a substantial, non-
> retaliatory basis for his decision to eliminate Waiting's position and
> terminate his employment.  As noted herein, Kivlehan reviewed the
> operations of the Bank's Finance Department and determined that the
> Department lacked clear direction and that job responsibilities were not
> clearly defined; that the Department was "top heavy"; and that the
> Department lacked strong senior leadership and a clearly defined reporting
> structure.  Kivlehan therefore decided to streamline the Department's senior
> leadership, and consolidate leadership of the Bank's accounting and tax
> functions under one person.  Kivlehan's legitimate business decision was not
> impacted in any manner by Waiting's allegedly protected activity under the
> FCA.

Bank Mem. at 15-16 (record citations omitted).  As the parties' agree, if a plaintiff establishes a

prima facie case of retaliation, the burden shifts to the defendant to produce evidence of a

legitimate, non-discriminatory reason for the termination decision.  Harrington, 668 F.3d at 31.

"This imposes merely a burden of production, not one of proof."  Id.  The parties agree further

that the Bank has put forth such a reason.  Therefore, the burden shifts back to the plaintiff to

prove "that the proffered reason is a pretext calculated to mask retaliation."  Id.  This court

finds that there are material facts in dispute, and that the jury must determine whether the

reason given by the Bank was a pretext for retaliation.

Without belaboring the point, there is evidence that challenges the Bank's version of

events that Kivlehan made an independent assessment to reorganize the department and to

eliminate Waiting's position.  Waiting points to testimony that Peterson was added to the

department by McNulty, with Parent's involvement, one month before Kivlehan arrived, and at a time when both Peterson and McNulty knew about Waiting's complaint. See PDF ¶¶ 24-26. Therefore, a jury can find that the "top heavy" department was created for the purpose of forcing Waiting out. Such a conclusion may be buttressed by the fact that Waiting was the only person whose employment was terminated. Moreover, as detailed above, Kivlehan was aware that Waiting was a whistleblower when he was making the decision as to which of the two people should be let go. Finally, the evidence regarding the extent of Parent's role in the decision to eliminate Waiting's position is also disputed. All in all, there is sufficient evidence from which a jury can decide that the reason given by the Bank was pretextual. Therefore, this court recommends that the Bank's motion for summary judgment as to Waiting's claim of retaliation under the FCA be denied.

C.  **Waiting's Claim of Retaliation Under FIRREA**

In Count I of his First Amended Complaint, Waiting has alleged that the termination of his employment violated the non-retaliation provision of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). This provision provides that:

> No insured depository institution may discharge or otherwise discriminate against any employee with respect to compensation, terms, conditions, or privileges of employment because the employee . . . provided information to any Federal banking agency or to the Attorney General regarding (A) a possible violation of any law or regulation; or (B) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety; by the depository institution or any director, officer, or employee of the institution.

12 U.S.C. § 1831j(a)(1). Waiting bases his FIRREA claim on his objections to alleged accounting irregularities and lack of internal controls, principally in connection with the Bank's decision to outsource its investment portfolio and its oversight thereafter. See Waiting Decl. ¶¶ 41-51.

[18]

FIRREA only protects complaints made to federal banking agencies and the Attorney General, it does not protect internal complaints.  See Lippert v. Cmty. Bank, Inc., 438 F.3d 1275, 1279-80 (11th Cir. 2006) (and cases cited).

To establish a prima facie case of retaliation under FIRREA, the plaintiff must show that "(1) the claimant engaged in the protected activity (e.g., filed a complaint or reported information to the government); (2) the defendants subjected the claimant to some materially adverse employment action, and (3) a causal connection existed between the protected activity and the adverse action."  Simas v. First Citizens' Fed. Credit Union, 170 F.3d 37, 44 (1st Cir. 1999).  Unlike the FCA, under FIRREA, "the third or 'causation' element is further eased, so as to require only a showing that the protected activity was a 'contributing factor' in the adverse action, not necessarily its substantial or motivating cause."  Id.  However, the burden of proof and production under FIRREA is comparable to that described above for the FCA.  Thus, if the plaintiff makes out a prima facie case, the defendant has the burden of articulating, not proving, a nondiscriminatory motive for its adverse action, after which the claimant "must bear the burden of proving that the nondiscriminatory motive articulated by defendants is pretextual and the real motive was the claimant's decision to exercise the 'whistleblower' rights endorsed by the applicable statute."  Id.

Similar to its position with respect to Waiting's FCA claim, the Bank argues that Waiting cannot establish a prima facie case of retaliation under FIRREA, and that, even if he could, he would not be able to establish that his protected disclosure was a "contributing factor" in the decision to terminate his employment, since "Kivlehan had no knowledge of the substance of Waiting's complaint that was forwarded to the FDIC, and Kivlehan was not involved in Clements

& Pineault's investigation of it."  Bank Mem. at 19.  For basically the same reasons described above in connection with the FCA claim, this court recommends that the Bank's motion for summary judgment be denied.  It is appropriate for a jury to determine if Waiting was engaged in a protected activity, whether such activity was a contributing factor in the decision to terminate his employment, and whether, if Waiting establishes a prima facie case, the Bank's non-retaliatory explanation for his termination was pretextual, and the real motive was the fact that Waiting was a whistleblower.

### Was Waiting Engaged In Protected Activity?

The Bank contends that the undisputed facts preclude Waiting from establishing "that he engaged in protected conduct under 12 U.S.C. § 1831j, either by reporting a possible violation of law, or by reporting 'gross mismanagement.'"  Bank Mem. at 17.  Waiting argues that he established "gross mismanagement" in connection with the Bank's continuing violations of banking regulations governing its accounting for and supervision over the Bank's investment portfolio, which was outsourced over Waiting's objections.  Pl. Mem. at 13-16.[5]  In this court's view, the assessment whether Waiting was engaged in protected activity when he complained about the Bank's practices is a question for the jury.

FIRREA does not contain a definition of "gross mismanagement."  Nevertheless, the parties agree that the case of White v. Dep't of Air Force, 391 F.3d 1377 (Fed. Cir. 2004), is instructive.  There, a civilian Air Force employee was terminated after complaining about a

---

[5]  The Bank interpreted Waiting's opposition to the motion for summary judgment as asserting that the Bank may have violated the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. § 78m(b)(2)(A-B).  See Bank Reply Mem. (Docket No. 68) at 1-2.  Waiting challenges the Bank's reading of his opposition, and denies asserting that the Bank violated the FCPA.  See Pl. Sur-Reply (Docket No. 74).  Since this is a non-issue in this case, it will not be discussed further.

curriculum-evaluation program adopted by the Air Force.  The issue presented on review of a

decision by the Merit System Protection Board was whether the employee could reasonably

have concluded that "the actions of the government evidence gross mismanagement."  Id. at

1381 (internal citation omitted).  The court held that "[m]ere differences of opinion between an

employee and his agency superiors as to the proper approach to a particular problem or the

most appropriate course of action do not rise to the level of gross mismanagement."  Id.

Where there is a difference of opinion as to policies adopted by the agency, "to constitute

'gross mismanagement,' an employee must disclose such serious errors by the agency that a

conclusion the agency erred is not debatable among reasonable people."  Id. at 1382.  "[T]he

employee need only establish that there was gross mismanagement based on the information

'known to and readily ascertainable by the employee.'"  Id. (internal citation omitted).  It does

not matter if "the agency can marshal other information supporting the policy that the

employee could not have reasonably obtained at the time of disclosure."  Id.  Apart from policy

issues, the Merit System Protection Board, applying White, has explained that "[g]ross

mismanagement means a management action or inaction which creates a substantial risk of

significant adverse impact upon the agency's ability to accomplish its mission.  It must be more

than de minimis wrongdoing or negligence, and does not include management decisions that

are merely debatable."  Johnson v. Dep't of Justice, 104 M.S.P.R. 624, 634, 2007 MSPB 42 (Feb.

6, 2007) (internal citation omitted).

 The Bank argues that Waiting's complaints constituted "debatable differences of

opinion" and thus are not protected.  Bank Mem. at 18.  In addition, the Bank argues that its

"thorough consideration of policy decisions with respect to its investment management

functions, its retention of outside counsel and auditors, and Clements & Pineault's prompt and thorough investigation of Waiting's concerns all conclusively demonstrate that the Bank never engaged in conduct that would meet the definition of gross mismanagement under 18 U.S.C. § 1831j." Id. at 19. For his part, Waiting argues that his "disclosures of accounting irregularities, internal control violations and general dysfunction in the finance department would meet White's test of 'serious errors', 'significant matter', and 'not debatable among reasonable people.'" Pl. Mem. at 16. In this court's view, it is appropriate for a jury to weigh the significance of Waiting's objections and the Bank's policies, practices and responses to Waiting's complaints. The record does not support a finding, as a matter of law, that Waiting did not reasonably believe that he was reporting "gross mismanagement." See White, 391 F.3d at 1381 (noting that issue presented to Merit Systems Protection Board in claim of whistle-blower retaliation was whether the employee "reasonably believed that he disclosed gross mismanagement"). Therefore, this court recommends that the Bank's motion for summary judgment as to Waiting's claim under FIRREA be denied.[6]

### D. Common Law Claim of Wrongful Termination

In Count IV of his Complaint, Waiting alleges that the Bank wrongfully discharged him in violation of public policy. While as a general statement "Massachusetts employers are free to terminate an at-will employee at any time and for any or no reason[,]" Massachusetts courts

---

[6] The parties' arguments concerning the other elements of the retaliation claim are substantially the same for the FIRREA claim as for the FCA claim. For the reasons discussed above in connection with the FCA, this court concludes that there are disputed facts from which a jury can find that Waiting satisfied the other elements of his prima facie case of retaliation, and that the Bank's proffered nonretaliatory reason for the termination was a sham. This is especially true given the lesser standard for causation under FIRREA. There is no need to repeat this court's analysis.

have created a common law cause of action for terminations in violation of public policy "when there is 'no other way to vindicate such public policy.'"  Bergeson v. Franchi, 783 F. Supp. 713, 717 (D. Mass. 1992) (quoting Melley v. Gillette Corp., 19 Mass App. Ct. 511, 512, 475 N.E.2d 1227 (1985), aff'd, 397 Mass. 1004, 491 N.E.2d 252 (1986)).  "For example, Massachusetts courts have created a common law cause of action for violations of public policy in the following instances: 'asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires (e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury).'"  Id. (quoting Smith-Pfeffer v. Superintendent of Walter E. Fernald State Sch., 404 Mass. 145, 149-50, 533 N.E.2d 1368 (1989)).  "Discharge of an employee in retaliation for his cooperation with a law enforcement investigation concerning his employer, also can be actionable."  Dineen v. Dorchester House Multi-Serv. Ctr., Inc., No. 13-12200-LTS, 2014 WL 458188, at *3 (D. Mass. Feb. 3, 2014) (and cases cited).  "Whistleblowing" also "may fall into this category."  Flesner v. Tech. Commc'ns Corp., 410 Mass. 805, 811 n.3, 575 N.E.2d 1107, 1111 n.3 (1991) (and cases cited); see also Mello v. Stop & Shop Cos., Inc., 402 Mass. 555, 560 n.6, 524 N.E.2d 105, 108 n.6 (1988) (Court assumes "that whistleblowing based on a reasonable, good faith (but erroneous) belief that the employer is violating the law should be protected in particular instances").

In the instant case, the Bank contends that Waiting cannot seek redress on "public policy" grounds since there are statutory schemes governing the same conduct on which Waiting is basing his common law claim.  It is undisputed that "where the legislature has already provided a remedy by enacting a comprehensive remedial statutory scheme, Massa-chusetts courts have not created a new, duplicative common law cause of action for a violation

of the public policy."  Bergeson, 783 F. Supp. at 717-18 (and cases cited) (internal citation

omitted).  Thus, the Bank argues, since Waiting bases his common law claim on the same

conduct that he contends violates the FCA and FIRREA, the public policy claim should be

dismissed.  Bank Mem. at 20-21.

This court recommends that the Bank's motion for summary judgment as to the public

policy claim be denied at this juncture.  As detailed above, the Bank itself has argued that the

conduct in which Waiting engaged is not protected by the FCA or FIRREA.  It is further undis-

puted that certain actions undertaken by Waiting, such as his internal complaints, are not

protected under the federal statutory scheme.  See Lippert, 438 F.3d at 1280 (concluding that

FIRREA does not protect an employee for making internal objections).  In his Complaint in this

action, Waiting alleges that he was fired in violation of Massachusetts public policies.  See

Compl. ¶¶ 114-15.  In sum, the record is not clear that there is a "comprehensive remedial

statutory scheme" which covers Waiting's common law claim.  Therefore, this court

recommends that his public policy claim be allowed to proceed.

For all of these reasons, this court recommends to the District Judge to whom this case

is assigned that the Defendants' Motion for Summary Judgment (Docket No. 51) be DENIED.

### IV.  ANALYSIS -
### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

By his motion for summary judgment, Waiting is seeking a declaration that he engaged

in protected activity under FIRREA (Count I) and the FCA (Count II).  For the reasons detailed

above, there are disputed facts as to whether Waiting engaged in protected conduct under

these statutes.  In particular, but without limitation, there are disputed facts as to whether it

was reasonable for Waiting to believe that the Bank was engaged in "knowingly" wrongful

conduct, as required by the FCA. See Karvelas, 360 F.3d at 236. Similarly, there are disputed

facts as to whether Waiting could reasonably believe that there was "gross mismanagement"

by the Bank, as required by FIRREA. See White, 391 F.3d at 1381-82. Consequently, a jury

should determine whether Waiting was engaged in protected activities, and summary judgment

should be denied.

## V. CONCLUSION

For all the reasons detailed above , this court recommends to the District Judge to

whom this case is assigned that both the Defendants' Motion for Summary Judgment (Docket

No. 51) and the Plaintiff's Motion for Partial Summary Judgment (Docket No. 54) be DENIED.[7]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[7] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).